IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 20, 2007

## STATE OF TENNESSEE v. WILLIAM ANDREW LONG

**Appeal from the Criminal Court for Campbell County**
**No. 12645     E. Shayne Sexton, Judge**

---

**No. E2006-01542-CCA-R3-CD - Filed April 20, 2007**

---

The Defendant, William Andrew Long, appeals from the sentencing decision of the Campbell County Circuit Court. In February of 2006, the Defendant pled guilty to kidnapping and robbery. Pursuant to the terms of the plea agreement, he received an effective twelve-year sentence as a Range I, standard offender, and the trial court was to determine the manner of service. Following a sentencing hearing, the trial court ordered the sentence to be served in the Department of Correction. On appeal, the Defendant argues that the trial court erred by ordering a sentence of total confinement rather than a less restrictive alternative. After review, the sentencing decision is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Robin W. Scott, Jacksboro, Tennessee, for the appellant, William Andrew Long.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William Paul Phillips, District Attorney General; and Scarlett Ellis, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

A Campbell County grand jury returned an indictment against the Defendant charging him with one count of especially aggravated kidnapping, one count of especially aggravated robbery, and two counts of aggravated assault.[1] The Defendant, a Range I, standard offender, pled guilty to one count of kidnapping and one count of robbery, see Tenn. Code Ann. §§ 39-13-303, -401, and the

---

[1] The indictment also included several co-defendants—Julia M. Long, Matt McCarty, and Chad Vann Roberts. A joint sentencing hearing was held, which involved Julia Long, Matt McCarty, and the Defendant.

remaining counts were dismissed.[2] The plea agreement provided for consecutive terms of six years on each count, resulting in an effective twelve-year sentence. The manner of service was to be determined by the trial court.

The official version of events contained in the presentence report summarized the facts as follows:

> During an investigation of an aggravated assault, Detective [Larry] Bolton [of the Campbell County Sheriff's Department] learned . . . the identity of the victim to be James T. Wilhoit Age 26 of . . . LaFollette, Tennessee. The Defendant . . . did assault the victim after using force to enter the victim's residence. The victim was removed by force from his residence by the Defendant and transported to . . . the residence of Chad Robbins. At this location, the Defendant did continue to assault the victim by beating and kicking him. The victim suffered numerous broken bones including a skull fracture and also a punctured lung. The victim was then transported in a truck belonging to Chad Robbins to a remote area in the Royal Blue Wildlife Management Area, approximately two miles from Interstate 75. The victim was bound with an electrical cord while being transported from South Highway 25-W to the Wildlife Management Area. At the Wildlife Management Area, the victim's clothing was cut off him, leaving him nude and the victim was abandoned there.

At the sentencing hearing, Officer Tony Rucker of the LaFollette Police Department testified that he was "running stationary radar on North Tennessee Avenue" on May 18, 2006. According to Officer Rucker, the Defendant drove past him at approximately 4:20 a.m. Officer Rucker initiated a stop of the vehicle because he had "prior knowledge" that the Defendant's license was revoked. Thereafter, Officer Rucker arrested the Defendant and charged him with driving on a revoked license and a violation of a motor vehicle habitual offender order.

Officer Rucker also testified that he knew Sergeant Monty Miller and that he was aware Sgt. Miller made "a report . . . regarding involvement with [the Defendant] earlier that morning on May the 18th of 2006[.]" According to Officer Rucker, Sgt. Miller placed the Defendant under arrest and charged him with possession of a Schedule III drug and tampering with evidence. The arrest warrant reflected the following facts: "[The Defendant] dropped an oblong pill 'Watson 502' onto the ground. [The Defendant] did not have a prescription for the pill . . . ."

Certified copies of both arrest warrants were entered into evidence. All of these charges were pending in general sessions court at the time of sentencing.

Officer Rucker testified on cross-examination that the Defendant offered an explanation as to why he was driving on a revoked license on May 18. According to Officer Rucker, the Defendant

---

[2] The transcript of the guilty plea proceeding was not included in the record on appeal.

explained that he was driving because "he was going to pick his brother up. His brother had called and wanted them to pick him up."

Mandy Palmiter testified that she prepared the Defendant's presentence report. She stated that, when the Defendant pled guilty to these charges on February 17, 2006, "he agreed to go ahead and report to [her] for some type of supervision . . . ." The Defendant was scheduled to meet with Ms. Palmiter "once every two weeks" and, on those occasions, the Defendant submitted to drug screens. According to Ms. Palmiter, the Defendant's drug screens were "negative . . . ." She stated that the last time she saw the Defendant was on May 9, that the Defendant failed to appear for his next meeting scheduled on May 23, and that she had not seen or heard from him since then. Ms. Palmiter further testified that she had, on "at least" two occasions, requested the Defendant to provide "a statement regarding this offense" and that he had failed to do so. She stated that the Defendant reported he was taking prescribed medications.

On cross-examination, Ms. Palmiter testified that, although the Defendant had been declared a motor vehicle habitual offender, his record did not include any driving under the influence convictions. She further testified that the Defendant had only one drug possession conviction and no convictions for violent offenses. Ms. Palmiter also stated that she was aware the Defendant suffered from a "learning disability and dyslexia" but that he did not express any concern "as far as making a statement . . . ." Moreover, she was aware that the Defendant "sought out anger management classes and attended those" and that he "tried to attend the Thinking For a Change Class although they had already started them . . . ."

The victim impact statement, which was attached to the presentence report, was introduced as an exhibit. The victim described in detail the circumstances of the attack and the injuries he suffered:

> Door forced in, kidnapped from residence. Beat with baseball bats, piece of wood, kicked, punched ect. [sic] all night untill [sic] unconscious and unrecognizable. Transported in various vehicles to different locations and then bound with electrical cord and left nude in remote wooded area in the Royal Blue Wildlife Management [A]rea. Found by [p]ark [r]anger, taken to St. Mary's Campbell County [H]ospital, then air lifted to U.T. Hospital in Knoxville. Had chest tube for punctured lung, placed on ventilator in ICU trauma unit for 2 days. Skull fracture with some bleeding and sewlling of the brain. Head and face were swollen and deep purple in color. Eyes were swollen shut, whites of eyes were blood red for up to 7 days, did not recognize mother for days. . . . Had fractured ribs, nose and every bone in the face was hair line fractured. Orbit of right eye was fractured but intact. Cannot hear as well from right ear.

Documents showing the victim's medical expenses—$42,000.00—were also introduced into evidence.

The Defendant called his sixteen-year-old step-daughter, K.L.,[3] to testify. She testified that, on the evening these events took place, she had been to a party at the victim's house. She stated that, while there, she was given alcohol and smoked marijuana and that, after she was under the influence, she was sexually assaulted. Her parents did not know that she had been to the victim's house. When she encountered her parents later that evening, she only told them that she "had been drinking" and identified the individual who had "obtained this alcohol" for her. She did not tell her parents about the sexual assault at that time. She stated that she then accompanied her parents, along with others, to the victim's home and witnessed the ensuing attack on the victim. According to K.L., her parents were not responsible for the most severe injuries inflicted upon the victim during the attack and her parents were not "in charge of things . . . ." Finally, she testified that her parents did not want to leave the victim in a remote area.

The trial court then held a bench conference off the record. Upon returning to open court, the trial court prohibited further inquiry into the varying levels of culpability of each Defendant, stating that "all three defendants pled to the same charge, to the same number of years, and I'm finding as a matter of law that there is very little, if any, significance to be placed on relative culpability at the time that this event occurred."

The Defendant then testified on his own behalf. Regarding his status as a motor vehicle habitual offender, the Defendant stated that he did not have a driver's license because he was never able to "pass the written test" and because he "got caught again and again, and it piled up . . . ." The Defendant also attempted to explain his conviction for possession of a legend drug, stating that he "had the bottle in [his] glove box . . . ." He further explained that he had not worked since 1994 or 1995 because he had been injured in a car accident and that he had "been on disability" since that time. The Defendant stated that he voluntarily reported to Ms. Palmiter for drug testing and that he was unable to make his scheduled appointments after "the baby was born" because he "just want[ed] to enjoy his family and the baby . . . ." The Defendant also explained that, when he was stopped by Officer Rucker on May 18, he was driving because the "baby was sick" and he needed "to go get some Pedialyte . . . ." Regarding the offenses that occurred several hours earlier, he explained that the pill on the ground discovered by Sgt. Miller did not belong to him. He further stated that he was unable to provide Ms. Palmiter with a statement because his wife was hurt and unable to help him prepare it.

On cross-examination, the Defendant stated that his wife did not have a driver's license and, thus, she could not drive to the store for the Pedialyte. The Defendant agreed that he had his "first chance" at probation and he "blew it." He further stated that he attended ten to twelve anger management classes but then stopped going. According to the Defendant, he had "no excuse for missing" those classes.

---

[3] It is the policy of this Court to identify minor victims of sex crimes by their initials.

Upon inquiry by the court, the Defendant testified that he took the following medications: "Oxycontin's, Percocet, Soma's, Xanax's, Klonopin's, Serizol (phonetic), Geodon and Viagra." He further stated that he took these medications on a daily basis.

Thereafter, the Defendant's wife, co-defendant Julia Long, testified. She testified that she did have a valid driver's license on the evening her husband went to the store but that she "couldn't find the card . . . ." Co-defendant Matt McCarty was the last witness to testify.

At the conclusion of the sentencing hearing, the trial court ordered that the Defendant's sentence be served in the Department of Correction. This appeal followed.

## ANALYSIS

The Defendant submits that the trial court erroneously denied his request for an alternative sentence. Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. See Tenn. Code Ann. § 40-35-210(b);[4] State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).

Upon a challenge to the sentence imposed, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. See Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). We will uphold the sentence imposed by the trial court if (1) the sentence complies with the purposes and principles of the 1989 Sentencing Act and (2) the trial court's findings are adequately supported by the record. See State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). The burden of showing that a sentence is improper is upon the appealing party. Id. § -401, Sentencing Commission Comments; Arnett, 49 S.W.3d at 257.

A defendant who does not possess a criminal history showing a clear disregard for society's laws and morals, who has not failed past rehabilitation efforts, and who "is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary. A court shall

---

[4] We note that the instant crimes occurred on June 9, 2005, and/or June 10, 2005. Thus, our legislature's recent amendments to the Criminal Sentencing Reform Act of 1989 are applicable to this case. See 2005 Tenn. Pub. Acts ch. 353 § 18. (effective date July 7, 2005).

consider, but is not bound by, this advisory sentencing guideline." Id. § -102(6)  The following considerations provide guidance regarding what constitutes "evidence to the contrary":

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant . . . .

Id. § -103(1).

Additionally, the principles of sentencing reflect that the sentence should be no greater than that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed.  Id. at (2), (4).  The court should also consider the defendant's potential for rehabilitation or treatment in determining the appropriate sentence.  Id. at (5).

Because the Defendant was convicted of Class C felonies, he should be considered as a favorable candidate for alternative sentencing.  See id. § -102(6).  In imposing its sentence, the trial court found as follows:

> This is a frightening case for an area like this to—and young adults engaging in behavior that could have easily resulted in a homicide. . . .  [T]he longer this goes and the more that I know about this case, the more frightening it is. . . .  [T]he behavior of the defendants begs the question of if . . . this party were going on involving this young lady, let's go to the police.  Let's talk to somebody else, . . . let's don't go up and take care of our business on our own.  I can't help but think that this entire incident was fueled by some type of—some type of dependent—either a dependency of either drugs or alcohol, or both.

> . . . .

> You know, [the Defendant] and Ms. Long, that was a [series] of excuses for everything that occurred, and I frankly have yet to hear a reason that would justify . . . the failure to cooperate with probation. . . .  I would have given [the Defendant] a drug test today, except I have no idea what would happen to the sample.  I mean, that just—a cocktail of drugs that is beyond comprehension.  No work, no—I mean,

we can drive around town, we can do this, that and the other, but we can't work and we take our medications. . . . [It] is a culture that leads to this type of behavior.

The trial court then proceeded to address each defendant individually in order to pronounce its sentence as it related to that defendant. The trial court denied co-defendant Matt McCarty, a Range II, multiple offender, an alternative sentence based upon McCarty's past criminal history and "the level of harm that arose from this particular offense . . . ." The trial court further noted that it was "not placing a great deal of emphasis on the relative culpabilities of each defendant" and that all three were "responsible."

In addressing the Defendant specifically and determining that incarceration was appropriate, the trial court ruled as follows:

[T]his Court has searched hard looking for . . . some way to justify alternative sentencing; I can't do it. There is zero indication that alternative sentencing will result in anything but continued misbehavior. And we've gone from HMVO's, and we've gone to driving offenses and we've gone to peddling drugs to violence, and this Court is not going to take the chance on that one again. . . . I see a young man who is addicted badly, and I'm not sure—well, I'm confident that he has no idea of the level of addiction, but there is simply no place for alternative sentencing with this type of behavior hanging around. The potential for violence to this level is not gonna be tolerated by this Court. . . . I don't see any, any reason to grant alternative sentencing and because of that, I'm going to remand [the Defendant] to the Tennessee Department of Correction[] for 12 years.

Finally, the trial court addressed co-defendant Julia Long and ordered split confinement. The trial court noted in pronouncing its sentence, "[T]his is so utterly serious, these accusations, and nobody seems to care. Nobody seems to want to reach out and explain, with the exception of Matt, what happened. . . . [A]nd so much of this case begs for punitive measures . . . ."

The Defendant argues that "the trial court failed to consider evidence regarding the nature and characteristics of the offense and denied the [D]efendant the opportunity to present evidence as to his role in the offense." He acknowledges that the trial court considered the circumstances of the offenses "generally" but contends that the trial court improperly prohibited him from introducing evidence pertaining to his role in these offenses. He argues that "it was co-defendant McCarty who consistently escalated the events of that fateful night" and that he "should not bear the equal burden of the mindless vigilante violence orchestrated by co-defendant McCarty." Finally, the Defendant submits that the circumstances of these offenses alone do not support a denial of an alternative sentence and points to the fact that co-defendant Julia Long received a sentence of split confinement.

-7-

Although the Defendant argues that confinement is not necessary to avoid depreciating the seriousness of the offenses, we disagree with the Defendant that the trial court based denial of an alternative sentence solely on this factor. Upon review of the trial court's findings, we conclude that it considered both the applicable sentencing principles and the particular facts of the case.

First, the trial court addressed the Defendant's criminal history, see Tenn. Code Ann. § 40-35-103(1)(A), and the Defendant admitted that the trial court considered the same. The presentence report showed that the Defendant had been adjudicated a motor vehicle habitual offender and was convicted of possession of a legend drug. The trial court further stated that the Defendant's criminal conduct had become increasingly severe—beginning with traffic offenses, then drug offenses, and now violent crime. Moreover, the Defendant continued to violate the law up until the time of sentencing. Since the Defendant's arrest in the instant case, he was charged with possession of a Schedule III narcotic,[5] tampering with evidence, driving on a revoked license, and violation of the motor vehicle habitual offender order. Officer Rucker testified at the hearing regarding these new charges, and we agree with the trial court that the Defendant only offered a "[series] of excuses . . . ."

Next, the trial court found that confinement was necessary to avoid depreciating the seriousness of the offenses. In order to deny an alternative sentence based upon the seriousness of the offense, "the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree," and the nature of the offense must outweigh all factors favoring an alternative sentence. State v. Hartley, 818 S.W.2d 370, 375 (Tenn. Crim. App. 1991); see also State v. Blackhurst, 70 S.W.3d 88, 98 (Tenn. Crim. App. 2001). We agree with the trial court that the circumstances of these offenses meet this standard. As noted by the trial court, the Defendant was a "principal[] in the commission of felony offenses" and was criminally responsible for the actions of his co-defendants. The Defendant was more than a minor participant in this attack, which lasted for several hours and occurred at multiple locations. The victim was beaten with baseball bats and a piece of wood and then left nude in a remote area; his injuries were extensive. All of this occurred while the Defendant's step-daughter was present.

Lastly, the trial court addressed whether measures less restrictive have frequently or recently been applied unsuccessfully to this Defendant. The Defendant acknowledged that he "blew" his voluntary probation by "picking up [new] charges" and failing to report thereafter. As previously noted, Officer Rucker testified about the Defendant's new charges, and Ms. Palmiter testified that the Defendant failed to report for his voluntary probation. The Defendant himself testified that he had "no excuse" for missing his anger management classes. Moreover, we note that the presentence report reflected that the Defendant was previously placed on community corrections. The trial court also found that the Defendant had a problem with drugs and/or alcohol. The Defendant's addiction problems could be treated in a correctional facility.

---

[5] The presentence report reflected that the charge was for Schedule II drugs, but the arrest warrant showed that Sgt. Miller discovered a Schedule III drug.

The facts of this case lend support to the determination that the Defendant's potential for rehabilitation is poor. A sentence of total incarceration is likewise reasonably related to the seriousness of the offenses. Furthermore, we conclude that the sentence imposed is no greater than that deserved for the offenses committed and is the least severe measure necessary to achieve the purposes for which the sentence is imposed. The record supports the trial court's decision.

## CONCLUSION

Based upon the foregoing, we conclude that the trial court did not err in denying the Defendant an alternative sentence. Accordingly, we affirm the sentencing decision of the Campbell County Circuit Court.

_____
DAVID H. WELLES, JUDGE